UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X

JUAN ANTHONY BIDOT,

                       Plaintiff,

      -against-

COUNTY OF SUFFOLK, Supervisor STEPHEN
LARSEN, in his individual and in his official
capacity, Principal Probation Officer THOMAS
BRANCO, in his individual and in his official
capacity, Probation Officer JAMES STITT, in his
individual and his official capacity, Acting Director
ANDREA NEUBAUER, in her individual and
official capacity JOHN DOES 1-10 in their
individual and official capacities,

                     Defendants.
------------------------------------------------------------------- X

**DOCKET NO.:  CV-19-03925**

          **(SJF)(ARL)**


**AMENDED COMPLAINT**


*JURY TRIAL DEMANDED*

Plaintiff JUAN ANTHONY BIDOT by and through his attorneys, the LAW OFFICES

OF FREDERICK K. BREWINGTON, as and for his Amended Complaint,  against the

Defendants, states and alleges as follows:

## PRELIMINARY STATEMENT

1.      Prior hereto, Plaintiff filed a Complaint on July 8, 2019. This is an amendment

of that Complaint which is done by grant of the Court, and as none of the Defendants in

this action have filed a responsive pleading as is contemplated by the Federal Rules of Civil

Procedure.

2.      This is a civil action seeking monetary relief (including past and on going

economic loss), compensatory and punitive damages, disbursements, costs and fees for

violations of the Plaintiff's rights, brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (as amended), 42 U.S.C. §§1981, and 1988, New York State's Human Rights Law, Executive Law Art. 15.

3.    Specifically, the Plaintiff alleges that the collective Defendants engaged in discrimination and retaliation and negligently, wantonly, recklessly, intentionally and knowingly sought to and did wrongfully deprive Plaintiff of the appropriate employment position and title and pay through acts that were taken against Plaintiff because of his race, color, and national origin, sex, disability and opposing discrimination. These acts resulted in misrepresentation, misinformation, harassment, character assassination, negative impact regarding Plaintiff's, humiliation, embarrassment, depravation of job opportunities, permanent injury and harm and other results which continue to mount.

4.    Plaintiff alleges that the collective Defendants, directly acted and/or allowed its agents, employees, representatives and/or officers to act maliciously and unconstitutionally, enacting discriminatory policies, which caused Plaintiff to suffer the following injuries:

- Violations of his various statutory rights, including those protected by Title VII of the Civil Rights Act of 1964, Article 15 of the Executive Law of the State of New York (Human Rights Law) §§ 290 and 296, Nassau County Human Rights Law;

- Violations of his Constitutional rights under the Fourteenth Amendment to the United States Constitution (Fourteenth Amendment) in violation of 42 U.S.C. § 1983, and violations of 42 U.S.C. § 1981;

2

- Complete, temporary, or partial loss of reputation;

- Loss of benefits, pay, and future income;

- Prolonged alteration of employment and/or temporary/partial alteration of employment opportunities; and

- Diminished capacity, incurring special, monetary, and compensatory damages.

5.    Said acts were done knowingly with the consent and condonation of the COUNTY OF SUFFOLK, SUFFOLK COUNTY DEPARTMENT OF PROBATION (hereinafter "PROBATION DEPT." or "DEPARTMENT"), STEPHEN LARSEN, in his individual and in his official capacity, THOMAS BRANCO in his individual and in his official capacity, JAMES H. STITT, in his individual and in his official capacity, ANDREA NEUBAUER, in her individual and in her official capacity with the express purpose of targeting, injuring and silencing the Plaintiff, and generally violating his rights as protected by the United States and New York State Constitutions, and federal and state statutes, rules and regulations.

## JURISDICTION AND VENUE

6.    The jurisdiction of this Court is invoked under 28 U.S.C. §§1331 and 1343.

7.    This Court is requested to exercise pendant jurisdiction with respect to Plaintiff's State law claims pursuant to 28 U.S.C.§ 1367.

8.     Venue in the Eastern District of New York is proper under 28 U.S.C. §1391, based on the fact that Plaintiff resides in Suffolk County, New York and the Defendants are conducting business in the State of New York, specifically Suffolk County.   Upon information and belief the individual Defendants reside in the Eastern District of New York.

9.     Prior hereto, on August 27, 2018 Plaintiff filed Charge of Discrimination Case No. 520-2018-05507 against Defendants with the U.S. Equal Employment Opportunity Commission (hereinafter "EEOC") alleging his wrongful discrimination due to the Defendants' animus on the basis of Plaintiff's race, color, and national origin and sex.

10.     Thereafter, on March 1, 2019 Plaintiff filed Charge of Discrimination Case No.20-2019-02240 against Defendants with the EEOC alleging that he has been retaliated against by Defendants after the filing of the EEOC Charge 520-2018-05507 on August 27, 2018.

11.     On April 9, 2019, Plaintiff received a Notice of Right to Sue Within 90 Days, issued by the U.S. Department of Justice with regard to EEOC Charge Nos. 520-2018-05507 and 520-2019-02240 (copies annexed hereto Exhibit A and Exhibit B respectively).  As of the filing of this complaint, ninety days from the date of receipt of the Notice of Right to Sue has not yet passed.

## PARTIES

12.     Plaintiff, JUAN ANTHONY BIDOT (hereinafter "Plaintiff" or "Bidot"), at all times relevant in this Amended Complaint, is a Gay Hispanic (Latino) male with brown skin originating from Puerto Rico, and is a citizen of the United States of America. Plaintiff resides in the County of Suffolk, State of New York.

13.     During all times relevant to this Amended Complaint the Defendant COUNTY OF SUFFOLK (hereinafter "COUNTY") was and is a municipality of the State of New York.    Upon information and belief, the COUNTY oversees, maintains, manages/supervises, and controls several departments, agencies and employees- including but not limited to the PROBATION DEPARTMENT, STEPHEN LARSEN, THOMAS BRANCO, JAMES H. STITT, ANDREA NEUBAUER (and JOHN DOES 1-10, and was and is the employer of members of the Suffolk County Probation Department. COUNTY is an employer within the definition of the New York State Executive Law, Title VII, and employs well over 15 employees.

14.     During all times relevant in this Amended Complaint the Defendant SUFFOLK COUNTY PROBATION DEPARTMENT (hereinafter "PROBATION DEPT.") is an agency of the COUNTY OF SUFFOLK and operates under the direction and on behalf of Defendant COUNTY.

15.     That DEFENDANTS, Supervisor STEPHEN LARSEN (hereinafter "LARSEN"), in his individual and official capacity, Principal Probation Officer THOMAS BRANCO (hereinafter "BRANCO"), in his individual and in his official capacity, Principal Probation Officer JAMES H. STITT (hereinafter "STITT"), in his individual and in his official capacity, Acting Director ANDREA NEUBAUER (hereinafter "NEUBAUER"), in her individual and in her official capacity, and JOHN DOES 1-10 in their individual and official capacities (hereinafter collectively referred to as "DEFENDANT PROBATION OFFICERS" or "DEFENDANT OFFICERS"), were at all times herein mentioned supervising probation officers, employed by the COUNTY OF SUFFOLK under the direction of Defendants, the DEFENDANT OFFICERS were acting in furtherance of the scope of their employment, acting under color of law, to wit under color of statutes, ordinances, regulations, policies, customs and usages of the State of New York and/or the COUNTY OF SUFFOLK.

## FACTUAL ALLEGATIONS

16.     Plaintiff is a bilingual Brown-Latino Gay man who is a graduate of SUNY Oswego with a Bachelors of Art in Psychology, and a Masters of Business Administration from Long Island University. Plaintiff resides in the County of Suffolk. Plaintiff suffers from a disability, including but not limited to Post Traumatic Stress Disorder related to his treatment and disregard by Defendants.

## PLAINTIFF'S EMPLOYMENT WITH THE COUNTY OF SUFFOLK

17.     Plaintiff began his career as an employee in the Suffolk County Probation Department on April 19, 1999. When he was first hired, Plaintiff held the title of Probation Officer. Plaintiff held that title until April, 2016 when he was promoted to Senior Probation Officer. Plaintiff was first assigned to Criminal Court Supervision, covering the areas of Patchogue and Blue Point from April of 1999 to November of 1999. Plaintiff was then assigned to the Gang Unit, Family Court Supervision from November 1999 to September of 2001. Thereafter, Plaintiff was assigned to the Criminal Court Supervision covering Brentwood and at one point covering Huntington from September 2001 to May 2007.

18.     Sometime in 1999, while Plaintiff was still going through training, Patricia Williamson, a Supervising Probation Officer, stated to Plaintiff that Plaintiff should make sure he don't get assigned to a Brentwood caseload because it is a dangerous neighborhood. She stated that Brentwood was infested with gang members, poor, and a high crime area. Officer Williamson then asked Plaintiff where he lived. Plaintiff stated that he had lived in Brentwood his entire life, his home had never been broken into, and he never had any problems growing up there.

19.     At all times relevant to this action, the Sex Offender Unit is staffed with 13 Probation Officers and 2 Supervisors.

20. Of the over 200 officers in the Probation Department there was only one person of color in the Supervisor's position, and none higher.

21. Plaintiff was thereafter transferred to the Sex Offender Unit in May of 2007 and remained in that unit for 11½ years. Plaintiff was the only Latino in the Sex Offender Unit Department for the 11 ½ years that Plaintiff was assigned to that unit.

22. At some point in 2007, the Probation Officers had the first "Womanless" Beauty Pageant in which male Probation Officers and staff dressed up as women and lip synced songs. At the time Plaintiff had not revealed that he was gay to his co-workers, however, Plaintiff was highly offender. Plaintiff did not attend the event.

23. Sometime in the Summer of 2008, Lisa Acosta, a Senior Probation Officer, was transferred out of the sex offender unit. At the time, Officer Acosta ran a sex offender group at the Probation Office with Pablo Guevara from Turning Point. When Officer Acosta left, there was no one to co-facilitate the Spanish speaking sex offender group. As a regular Probation Officer, groups were not part of Plaintiff's job description. Joseph Abramo, offered Plaintiff, the only Spanish speaking Probation Officer in the unit, overtime for covering the group.

24. June Kenny, an acting Principal Probation Officer, later said to Plaintiff that they couldn't give him overtime, but Plaintiff could do it for flex time. Plaintiff stated that if he didn't get overtime he would not be interested in covering the sex offender group.

Plaintiff also stated that Officer Douglas Forgione (a white heterosexual male) and Officer Ronald Halcrow (a white heterosexual male) got overtime when they covered a group and what made Plaintiff different from them. Officer Kenny then stated that she would try and find another Spanish speaking probation Officer from another building that would be willing to do the sex offender group. Plaintiff stated that she could try but the few Spanish speaking Probation Officers had young children, and doubted they would want to work with that population.

25. In response, Officer Kenny stated to me, "You know anyone of us can get transferred at anytime." Plaintiff took that as a threat and didn't say anything else. Days later, Officer Joseph Abramo came to Plaintiff and said that they had decided to give Plaintiff overtime for the groups.

26. On or about Spring/Summer of 2010 Plaintiff was scheduled to attend a week long sex offender training in Albany. Plaintiff was told by Officer Joseph Abramo, a Supervising Probation Officer, that Plaintiff would no longer be going and was being replaced by Michael Kordan, a white heterosexual male, who would be taking Plaintiff's place. Plaintiff inquired the reason he was being replaced, but Officer Abramo was unable to give Plaintiff an answer. Officer Michael Kordan had less seniority than Plaintiff in the both the Department and in the Unit.

27.     On September 1, 2015, Plaintiff conducted a search of one of his probationers with Senior Probation Officer, Stephen Larsen. The probationer was in the middle of watching child pornography, inserting sounding rods into his penis while masturbating. We conducted our search and confiscated his sex tools and electronics. After leaving, the probationer attempted to cut his wrists, put duck tape on his wrists, went into the garage, grabbed his ladder, climbed to the second floor. He ultimately committed suicide by jumping of the roof.

28.     Plaintiff returned to the office to write his notes into the computer system when Plaintiff got a call from a coworker that the probationer had committed suicide. Plaintiff completed the note and entered it into the computer system.

29.     On or about September 1, 2015, Plaintiff contacted Jay Jerger, Principal Probation Officer, and explained to him what happened during the home visit, and what transpired after we left. Plaintiff expressed to him at that moment that he no longer wanted to be in the sex offender unit. When Plaintiff spoke to Stephen Larsen about the probationer committing suicide, he responded by saying, "Now you have one less fucking sex offender to deal with."

30.     On or about October 1, 2015, when Plaintiff was doing my bi-annual reports, Plaintiff noticed that the note he had written on the probationer that had committed suicide had been removed. Plaintiff went into Jay Jerger's office and mentioned that the note had

been removed. Officer Jerger questioned Plaintiff if he had written the note. Plaintiff assured him that he had in fact written it before leaving for the day. Officer Jerfer told Plaintiff to contact Shirley Glover who was part of the IT department. Ms. Glover was unable to determine who or how the note had been removed. Plaintiff was directed to rewrite the note in the system.

31.     In December 2015, Plaintiff wrote a desk audit to the Suffolk County Civil Service explaining to them that he was doing the work of a Senior Probation Officer as a Probation Officer. It was approved in April 2016 and his position was earmarked as a Senior Probation Officer. Once three people that were ahead of Plaintiff on the civil service promotional list were promoted, Pliantiff was automatically promoted to Senior Probation Officer. That occurred at the end of April 2016.

**PLAINTIFF'S PROMOTION TO SENIOR PROBATION OFFICER**

32.     Plaintiff was promoted to Senior Probation Officer in April of 2016 as the result of Plaintiff taking a test and then being promoted off a Civil Service List. Plaintiff was a Spanish speaking Probation Officer who was promoted to a Senior Probation Officer. It must be noted that there is no Spanish speaking Senior Probation Officer title.

33.     From 1999 to July 2018, Mr. Bidot had no disciplinary history in his 19 ½ years in the Probation Department.

34.     As a Senior Probation Officer in the Sex Offender Unit, Plaintiff's duties included, but were not limited to, office reports twice a month, which consisted of meeting with probationers in his office and drug testing them, breathalyzing them, confirming their address, phone numbers, employment, ensure they have had no police contact, talk about their pending charges, ensure their compliance with the sex offender registry, go over the crime they committed in detail and make sure the Probationer completed up to three (3) types of polygraphs.  Plaintiff also co-facilitated a sex offender group one per week.

35.     Plaintiff's duties as a probation officer also consisted of doing home visits to probationer's domicile. On the days that Plaintiff made home visits he used a county car and was to make and track mandatory home visits to his assigned probations.

36.     Probation Officers track positive or negative home visits using Day Sheets, that is, they keep worksheets in their cars and record home visits as they are made. The information recorded on the Day Sheets is then supposed to be recorded into a Case Load Explorer software system. Day Sheets are also submitted every four weeks with the employee's time and accrual packet.

37.     Plaintiff worked 4-5 days a week, which consists of a total of a minimum of approximately 35 hours a week. However, Plaintiff regularly worked after hours due to phone calls he received from his probationer's therapists, some of them being Spanish speaking.  Because of his ability to speak Spanish, Plaintiff was often called on to perform

duties that his non-Spanish speaking colleagues were required to do such as: translating and assisting other officers in the Sex Offenders unit with Spanish speaking probationers or their family members, including search and seizure.

38. On September 17, 2017 Plaintiff married his husband, and O September 19, 2017, when eh returned to work, publicly disclosed that he was a gay man to his co-workers for the first time in his career with the Probation Dept. Upon information and belief, Plaintiff is the only openly gay man in the entire Probation Dept.

39. On September 21, 2017, Supervisor Larsen requested to meet with Plaintiff to have a case load review meeting. At the conclusion of the case load review meeting, Supervisor Larsen said "oh and by the way congratulations." Supervisor Larsen then smirked making a non-verbal sound, shaking his head left and right in a "no" or "disapproval" gesture. This made Plaintiff feel extremely uncomfortable.

40. As a result of working in the Sex Offenders Unit for 11-1/2 years, Mr. Bidot began to feel the stress of being assigned to that Unit.

41. On February 1, 2018, Mr. Bidot made numerous verbal requests to be transferred out of the Sex Offender Unit to the Domestic Violence Unit, after becaming aware of a Senior Probation Officer in that unit requested a transfer out of the Domestic Violence Unit. Plaintiff submitted his requests to the following individuals:

- Andrea Neubauer, Director of Probation - via email
- Thomas Branco, Principal Probation Officer - via email and in person

- James Stitt, Principal Probation Officer - via email and in person
- Tracy Peterson, Principal Probation Officer - via email and in person
- Jay Jerger, Principal Probation Officer - via phone call
- Terri Dohrenwend, Program Coordinator Probation Officer - in person
- Laura Calagiri, Supervising Probation Officer - via email and in person
- Stephen Larsen, Supervising Probation Officer - via email and in person
- Peter Kwiaatkoski, Principal Probation Officer
- Ed Goldsmith, Program Coordinator Probation Officer

42. Plaintiff's request of the transfer fell on deaf ears

43. Instead, Mr. Bidot was told Defendant Stitt's that he would never get out of the Sex Offender Unit because he was Spanish speaking. After getting no action from making his verbal requests to be transferred, Bidot requested a transfer in writing in February of 2018 and pleaded, for his health and well being, that he be removed from the Sex Offender Unit. Defendants knew that Plaintiff was suffering from a disabling condition and failed to help him or provide any treatment. During the arbitration, Defendant Larsen testified that he felt Plaintiff may be burnt out, and should be granted a transfer.

44. On June 14, 2018, Plaintiff went into Defendant Stitt's office to advise him that Plaintiff was interested in putting in for the Family Court Liason position in Central Islip. The first thing out of Defendant Stitt's mouth was, "they are never going to let you out because you are Spanish speaking." Plaintiff then told Defendant Stitt that he had been in the unit for over 11 years and that he was done. Instead of addressing Plaintiff's urgent need, Defendant Stitt then asked Plaintiff if Michael Kordon, who had just been promoted to supervisor, had been in the sex offender unit. Plaintiff responded by saying yes.

Defendant Stitt then said, "I would love to get him in this unit." Plaintiff responded that he was going to talk to Defendant Branco about a transfer.

45. On June 14, 2018, after speaking to Defendant Stitt, Plaintiff went to speak to Defendant Branco. Defendant Branco is a Principal Probation Officer in title, but he oversees the other Principal Probation Officers. Plaintiff told Defendant Branco that he was interested in the Family Court Liaison Position. Defendant Branco stated Plaintiff did a great job, that Plaintiff was well respected by his peers, and that he thought Plaintiff would be great at being at a Family Court Liaison Position. Defendant Branco encouraged Plaintiff to put in for the position of Family Court Liason, which he did.

46. On the same date, Plaintiff called Laura Calagiri, Supervising Probation Officer for the Family Court Liaison position. Plaintiff expressed his interest in position and she stated that she would love to have him in her unit.

47. On the same date, Plaintiff called Tracy Peterson, Principal Probation Officer for the Family Court Liaison position. Plaintiff expressed his interest in the position and she stated that he should send an email.

48. On the same date, Plaintiff went to the office of Stephen Larsen, Supervising Probation Officer of the sex offender unit and expressed his interest in the position of Family Court Liaison position. He just said, "Ok".

49.     On the same date, Plaintiff returned to his office, and composed an email addressed to Andrea Neubauer, Acting Director, Thomas Branco, Principal Probation Officer, James Stitt, Principal Probation Officer, Tracy Peterson, Principal Probation Officer, Laura Calagiri, Supervising Probation Officer, and Stephen Larsen, Supervising Probation Officer, expressing a desire to be transferred to the Family Court Liaison position that was vacated.

50.     On July 19, 2018, Plaintiff was called into the Defendant Neubauer's office, and was handed a letter stating that Plaintiff needed to report to Labor Relations on August 3, 2018 regarding allegations of misconduct.

51.     Instead of his transfer being granted, Plaintiff learned on July 19, 2018 that he had to report to Labor Relations for allegations of misconduct. Plaintiff was not provided any charges on July 19, 2018. Plaintiff was not permitted to ask any questions.

52.     The Department failed to follow the supervisor's policy. Defendant Larsen never addressed any issues regarding work performance with Plaintiff. This fact was admitted under oath by Defendant Larsen during the Arbitration.

53.     Clearly, Defendant Branco was intending to mislead Plaintiff and while pretending to encourage Plaintiff to apply for the Family Court Liason position, Defendant Branco was speaking with Defendant Larsen and told Defendant Larsen that he wasn't going to transfer Plaintiff.

54.    On August 3, 2018, Plaintiff received a document entitled Statement of Charges and Notice of Hearing. That document was which obviously being planned ahead of time, as the document was dated "August ___ 2018", was signed by Defendant Andrea Neubauer, Acting Director, Department of Probation. It took two weeks to be supplied with charges as Plaintiff was informed on July 19, 2018 that these disciplinary charges were being brought against him.

55.    In reviewing that document, Plaintiff learned that he was being accused of two (2) Charges which included forty (40) Specifications of alleged misconduct and/or incompetence charging "FRAUDULENT/INACCURATE DAY SHEETS AND /OR CE RECORDS" and "FAILURE TO PROVIDE A FAIR DAY'S WORK FOR THE BASE RATE PAID" (Emphasis in original) in connection to his categorization of time and attendance. Due to these charges being brought against Plaintiff he was immediately suspended for 30 days without pay, and was told that he was facing possible termination.

56.    In September 2018, Plaintiff was transferred to the Pre-Sentence Investigations Unit, in which the exposure to sex offenders continued.

57.    In reviewing the charges and specification, provided to him, Mr. Bidot was deeply hurt and in shock of the charges brought against him as his categorization of his time and attendance while a probation officer in the Sex Offender Unit was the same as his co-workers who were not gay and not Latino, however Mr. Bidot's co-workers were not

17

subjected to audits, charges, suspension, or possible termination. These charges were brought by Defendant Larsen in the Sex Offender Unit with the complete knowledge and agreement of Defendants LARSEN, BRANCO, STITT and NEUBAUER. Based on the differential treatment to which he has been subjected, and manner in which these charges were brought, Plaintiff believes he is being singled out by Defendants because he is Latino, and because he is openly gay.

58.    As was common practice all officers in the Sex Offender's unit would have caseload reviews on a monthly basis where Plaintiff and Defendant Larsen would review 1/3 of Plaintiff's caseload. Any issues that would arise would be addressed. All Officers in the sex offenders' unit would do the same. During caseload review, Defendant Larsen never addressed any issues regarding Plaintiff's job performance. The investigation into Plaintiff's job performance allegedly started after a complaint was allegedly made by Judge Kahn from the sex offender court on October 24, 2017. This alleged complaint was allegedly made fifteen (15) days after Plaintiff returned to work from his honeymoon.

59.    The charges leveled against Plaintiff demonstrated that Plaintiff was being treated differently by being subjected to audits, and having his job and career placed in jeopardy by the commencement and escalation of charges and specifications for tracking his time and attendance in the same manner as his co-workers who are not Latino and upon information and belief are not Gay.

60.     In addition, despite Plaintiff's seniority in the unit, he was not assigned a cell phone, while others with less seniority were.  The following individuals, who had less seniority than Plaintiff was provided a cellular phone:

- Angela Minichello    White Female       Heterosexual
- Melissa Anderson    White Female       Heterosexual
- John Guacci          White Male          Heterosexual
- Eric Stahlberg        White Male          Heterosexual
- Lara Watrous         White Female       Heterosexual
- Christine Larkin      White Female       Heterosexual

61.     On August 27, 2018 Plaintiff filed his Charge of Discrimination with the New York State Division of Human Rights and the Equal Employment Opportunity Commission under EEOC No.: 520-2018-05507, alleging discrimination on the basis of his sexual orientation, and his national origin in violation of Title VII of the Civil Rights Act of 1964, as amended.

62.     Upon information and belief, Plaintiff's initial Charge of Discrimination was received by the Defendants in or about September 2018.

63.     At the conclusion of Mr. Bidot's 30 day suspension without pay, on September 11, 2018, Plaintiff returned to work, and was directed to return back to the Sex Offender Unit. Mr. Bidot protested to his Union President Matthew Porter about this assignment.  Mr. Bidot promptly expressed his dismay, and fear for his health of being returned to the Sex Offender Unit, especially in light of his numerous requests to be

19

removed for years, and due to the charges placed against his by Supervisor Larsen in the Sex Offender Unit.

64. Prior to the Charges, and after 11 ½ years of being in the Sex Offender Unit, Mr. Bidot was finally transferred out and placed in the Pre-Sentence Investigation Department in Central Islip and remained there until September of 2018. However, as part of acts of discrimination and retaliation, the County continued to expose Plaintiff to sex offenders by requiring Plaintiff to do pre-sentence investigations on both Spanish and Non-Spanish speaking sex offenders, and non sex offenders.

65. Plaintiff's performance in the Pre-Sentence Investigation Department has been without incident to date.

66. An Arbitration Hearing was scheduled to take place on November 7, 2018. However, it was canceled, and Defendants then filed a First Amended Statement of Charges and Notice of Hearing dated November 7, 2018 and signed by Defendant Andrea Neubauer, Acting Director, Department of Probation, which increased the number of Charges and Specifications from 40 counts to 95 Counts Misconduct and/or Incompetence and adding a third charge of "MISCONDUCT: FAILURE TO TRUTHFULLY COOPERATE WITH A DEPARTMENTAL INVESTIGATION" (Emphasis in original). These charges were brought by Defendant Supervisor Stephen Larsen in the Sex Offender Unit with the

complete knowledge and agreement of STEPHEN LARSEN, THOMAS BRANCO, JAMES H. STITT and ANDREA NEUBAUER.

67.     It must be noted that, upon information and belief, new charges were filed after Defendants received Plaintiff EEOC Charge of Discrimination, dated August 27. 2018.

68.     Thereafter, on March 1, 2019, Plaintiff filed a further claim, this time with the EEOC, Claim No.: 520-209-02240, in which he charged the Defendants with retaliating against him by filing amended charges in response to Plaintiff opposing his discriminatory treatment by Defendants and filing his initial EEOC Complaint in August of 2018.

69.     After months, Arbitration hearings were held on four days, which included January 3, 2019, January 22, 2019, March 14, 2019 and April 9, 2019. The first date of the Arbitration Hearing took place on January 3, 2019 where Plaintiff learned for the first time that the investigation into his performance stemmed from an alleged complaint from Hearing Officer Resource Coordinator, Maureen Hardy, in April 2017, and Judge Barbara Kahn on October 24, 2017 to Supervisor Larsen. Instead of providing Plaintiff with notification in October, 2017 by asking Plaintiff about it, providing a warning, a reprimand, providing training, or beginning a path of progressive discipline, Defendant Larsen waited until Plaintiff disclosed he was openly gay to investigate, and waited to give notice to Plaintiff that they disagreed with his job performance until almost 15 months later – after Plaintiff came out as gay man. These decisions, and the collusion to take these steps, was

agreed to by Defendant Larsen in the Sex Offender Unit, with the complete knowledge and agreement of Defendants LARSEN, BRANCO, STITT and NEUBAUER.

70. At said Hearings, before Arbitrator David Stein, Esq., one hundred and fifty four (154) exhibits were received and testimony was taken in the form of direct and cross-examination of witnesses, Supervising Probation Officer Steven Larsen (for the County) and Plaintiff, and Dr. Gary Aumiller (for Plaintiff and the Unions).

71. In his testimony Dr. Aumiller explained that Plaintiff suffered from Post Traumatic Stress Disorder and that as a result of Defendants action, Plaintiff might not have done his job because:

> "What ends up happening is people get into desperate stages, they just stop doing there work, they stay in a survival state. Once you get into a survival state, you do things you have to do to survive. Sometimes – Anthony is a good guy, he seems to be a good guy. I think the survival is, when he go in the survival state, he would sit at his parent's house, he would sit, he would pass by. He wouldn't go and do his job. And then, when they get desperate and they are confronted with that, they have a tendency to justify and try to get by it."

72. Mr. Bidot had spoken to supervisors as early as September 1, 2015 about getting out of the Sex Offender Unit. On June 14, 2018, Plaintiff was told by Defendant Stitt he was never going to get out of the unit, because he was Spanish speaking. Plaintiff also officially requested transfers via email on February 1, 2018 and on June 14, 2018 but was not removed from the sex offender unit until after he was disciplined in August of 2018.

73.     According to Dr. Aumiller the industry practice in the field is 3-5 years with a max of 5-7 years in a sex offender unit. Mr. Bidot was forced to work in that unit for nearly twelve (12) years.

74.     During the Arbitration, Supervisor Larsen testified that he was aware of Bidot's request for a transfer due to his extensive period in the Sex Offender Unit which caused him to be "burn[t] out." In fact, Defendant Larsen admitted that he knew that Plaintiff needed to be transferred and was ordered not to discuss the transfer with Plaintiff.

75.     During the Arbitration, Supervisor Larsen testified:

"When I brought it to his [Principal Probation Officer Thomas Branco] attention, I referenced the information that I had found. I also stated that Officer Bidot had requested a transfer out of the unit and indicated that it's not uncommon for officers to experience burn out working within the sex offender population. So, I assumed that could definitely be a possibility. And I suggested that we give him his transfer request because his work is not adequate enough for the unit. He's asked to be out. I said, let's give him out. He suggested that I hold off. I was instructed not to discuss this with Officer Bidot.".

76.     Defendants gave no support or assistance to Mr. Bidot. Instead, Defendants ignored Mr. Bidot's mental health needs, and punished Plaintiff for his alleged lack of work performance, which was a direct result of the PTSD caused by the Defendants' and the Department's failure to properly monitor Plaintiff in the sex-offender unit. Additionally, Defendants purposefully punished Plaintiff only after they found out that Plaintiff was gay.

77. In attempt to ruin Plaintiff and end his career and damage him permanently, Defendants sanctioned and brought charges against him which they knew were baseless, frivolous and pretextual.

78. The gravamen of Charge 1, Specifications 8-16 was that Plaintiff did not make the home visits and the entries were incorrect. The Defendants had to acknowledge that some vehicles had been decommissioned. Defendant Larsen was shown the Checklist for Use of Probation Vehicle Fleet #29408, and admitted that if he would have pulled the checklist for Fleet #29408 for August 2017 he would have realized that Mr. Bidot did use that vehicle from 9:45am – 4:00pm.

79. Defendant Larsen further admitted that he never reviewed the correct STOP reports that included Fleet #29408.

80. With respect to Charge 1, Specifications 59-65, Defendants alleged that Mr. Bidot committed misconduct when he documented home visits for sex offenders in his day sheet and the CE system. The gravamen of these specifications is that he did not make the home visits and the entries were incorrect. The County withheld and intentionally failed to enter into evidence the STOP reports for Fleet #32743 in its direct case to prove Plaintiff did not make the documented home visits.

81. However, on cross-examination Defendant Larsen was shown the STOP report for April 18, 2018 for Fleet #32743. That document clearly demonstrated that Mr.

Bidot made the home visits contained in specifications 59, 60, 62 and 63. Knowing that he had failed to review the necessary records to accuse Plaintiff, Defendant Larsen admitted that if he had reviewed the STOP report for April 18, 2018 for Fleet #32743 he would have not recommended charges related to the home visits for April 18, 2018.

82.     For the remainder of charges in Charge, the Defendants did not produce STOP reports for the corresponding dates for all active vehicles, and decommissioned vehicles and had to admit that the charges brought against Plaintiff were not supported. During cross-examination the Arbitrator engaged Defendant Larsen:

> Arbitrator Stein: I guess the record would show that with respect to the dates and Specifications if the stop reports weren't included with the other exhibits, which purported to establish wrongdoing or incompetence with respect to those dates, you could make and argument that he couldn't possibly reach a conclusion without having the stop reports.

> Would you agree to reach a conclusion that if a visit was made in a County vehicle, you would need to have the stop reports?

> Stephen Larsen: I would need the stop reports for all active vehicles and decommissioned vehicles as well.

83.     Specifications 1-7; 17-25; 35; 37; 38; 47-49; 53-55; 57; and 58 had no corresponding STOP reports. And specifications 26-34; 39-46; 50-52; 56; and 66-68 only had STOP reports for one vehicle and did not include the rest of the active Fleet or the decommissioned vehicles.

84.     As such, Charge 1, Specifications 1-68 were frivolous, and were attempts by Defendants to wrongfully harm Plaintiff, and terminate Plaintiff because of his race, color, national origin, sex/gender/sexual orientation, disability and in retaliation for Plaintiff opposing his wrongful treatment by filing Charges of Discrimination with the EEOC.

85.     Defendants accused Plaintiff of being a thief. All charges in Charge II - Misconduct/Incompetence: Failure to Provide a Fair Day's Work for the Base Rate Paid were all based on specifications 1-68 of Charge I, and were therefore frivolous and pretextual in hopes of wrongfully terminating Plaintiff because of his race, color, national origin, sex/gender/sexual orientation, and in retaliation for Plaintiff filing Charges of Discrimination with the EEOC.

86.     With respect to the Charge III, Defendants claimed that Mr. Bidot failed to truthfully cooperate with a departmental investigation. However, Defendants did not present any testimonial evidence to establish how he failed to truthfully cooperate. It merely alleged the charge and specifications by introducing Mr. Bidot's compelled answers to an investigatory interview on August 3, 2018. However on said interview on August 3, 2018 Plaintiff did not have the GPS maps before him to answer the questions posed to him with more specificity. The fact that Plaintiff recounted his normal practice based on the information he had before him does not render his answers as untruthful or uncooperative. Therefore, the County failed to prove Charge III Specifications 1-5.

87. Plaintiff Bidot has been significantly damaged. Plaintiff was being treated by a therapist by the name of Jill Friedman, a social worker in private practice. Mr. Bidot has been diagnosed with post traumatic stress disorder as a result of being on the sex offender unit for 11 ½ years.

88. Mr. Bidot witnessed horrific incidents, including, but not limited to Plaintiff walking in on a probationer watching a grandfather sexually bent over his grandchild, and the memory of a man he caught with computer porn, and in or about September 1, 2015, when that individual learned that Plaintiff was going to violate his probation, that individual promptly killed himself.

89. After that incident, Plaintiff was told by County Attorney Gregory Spicer that he would never be required to work with sex offenders again. Plaintiff expressed to Mr. Slicer how the suicide and other things Plaintiff had experienced affected him.

90. On March 10, 2018, Mr. Bidot has been diagnosed with the "DSM F 43.11 and F 43.12 or both chronic and acute." "The chronic part is from having been in the sex offender unit for so long and the acute diagnosis comes from the subsequent arbitration for his job".

91. Plaintiff Bidot's PTSD symptoms include, but are not limited to: extreme irritability, recurrent images, paranoia, altering of social life, altering of family life, loss of trust in institutions, avoidance of cues to overstimulate, anxiety, withdrawal from others,

sleep deprivation, early wakening, trouble falling asleep, labile emotionality, a change in libido, and sexual contact with his husband, and he had major weight gain in the past few years which is often a sign of stress. All these factors were known and noticed by Defendants, especially Defendants Larsen and Branco.

92. After the suicide of a probationer on September 1, 2015, Mr. Bidot would avoid seeing people. "He has a strong visceral response to any work that is sex offense work; He has a strong emotional response to sex offender work; He reports continuing images and dreams of his time working with sex offenders that severely affect his sleep and waking hours; He continues to have a negative reaction to seeing the sexual crime and even going to the groups that deal with sex offenders."

93. Dr. Aumiller has stated that "The Internet Crime Against Children Task Force Program (or ICAC) is an organization of over 60 task forces representing 4500 agencies in federal, state and local law enforcement. Many of these 60 task forces have probations departments as part of the local task force. Suffolk County was part of the ICAC organization, as was the city of New York. It is not known if Suffolk Probation is included in the ICAC Task Force (but it should be). ICAC have set forth guidelines for the work of officers, agents and detectives investigating crimes against children (Wolak and Mitchell, 2009) (Office of Juvenile Justice and Delinquency Prevention, 2008)." These guidelines include two conclusions:

" 'First, *it is important to be aware of and acknowledge that exposure to child pornography can cause problems for some personnel.*

Second, *awareness is enhanced by education and training.*" (Wolak and Mitchell, 2009 p, 9 – 10). Despite being part of the organization, Suffolk County does not provide any training in the mental health area for their employees. In addition the ICAC organization made eight in-depth recommendations:

1. "*Education and training about possible negative reactions to viewing child pornography should be provided to all involved personnel.* All supervisory personnel in ICAC Task Force programs, including those who work in affiliate agencies should receive such training. Prosecutors, civilian forensic analysts, and other civilians involved in these investigations should also be included in education and training. Survey participants suggested including this topic in technical training classes and creating materials that would be available to spouses and others. Survey participants noted that undercover investigations in which personnel pose as minors also create difficulties for some personnel because of their sexually explicit content. For example, *"Those that engage in undercover chat operations or those that work cases involving communication between adults and children are exposed to material that I believe can be just as harmful …"* Problems related to such investigations should be addressed with education and training.

2. *The possibility of adverse sexual reactions should be openly discussed.* Only 5% of participants said their programs had, in the past year, held staff meetings or training sessions that included discussions of possible sexual problems related to viewing child pornography. Yet it appears from survey comments that some participants were plagued with reactions such as intrusive images and thoughts that impaired their ability to engage in healthy sexual relationships – and, for some individuals, counseling helped them to overcome such problems. Personnel experiencing sexual distress should be pro-vided with resources and encouraged to seek help. Developing written materials on this topic would also be helpful because some people may be reluctant to seek help for sexual problems. Materials should be prepared with the input of experienced counselors and created to be shared with family members and romantic partners, in case personnel need help in explaining issues and gaining understanding from their partners.

3. *Employees should be clearly informed about the nature of child sexual exploitation investigations and given the opportunity to turn down assignments.* While many agencies allowed personnel to choose whether to work child pornography cases, not all did. For many employees, who are confronted with all types of crimes and expect to handle whatever they are faced with,

this may not be a problem. But such work may be particularly difficult for some personnel for example, some with histories of child sexual abuse and some who are parents. Making sure that personnel are clearly informed about the nature of the work and allowed to opt in or out will help to avoid placing personnel who may be particularly prone to negative reactions in positions where they may not be able to function well or remain. There was strong support for introductory programs for per-sonnel beginning assignments that require exposure to child pornography, but few agen-cies had such programs in place. These would be an ideal place to alert personnel to possible problems and explain available supports.

*4. Address isolation among personnel by recognizing the needs of small agencies and units, prosecutors, and civilian employees.* Personnel who are working in relative isolation can be supported by training supervisors to understand the types of problems some personnel experience. Encouraging regular phone calls and check-ins by ICAC Task Forces to staff in small affiliates and prosecutors' offices, holding regular meetings or trainings that include all impacted employees, and assisting smaller agencies when investigations arise in their jurisdictions would help to alleviate feelings of isolation in these agencies.

*5. Acknowledge the frustrations of trying to conduct investigations with insufficient re-sources.* Lack of technical and training resources were problems for many agencies. Several participants remarked that the efforts of their agencies were hindered by administrators that did not view child sexual exploitation investigations as priorities or under-stand the resources required. Another noted, *"The task force is growing and affiliates are being added, but infrastructure is not keeping pace."* While there is often no easy solution to a lack of funds, there may be ways to ease the problem. Examples include educating commanders in larger agencies, reaching out to those responsible for funding, setting priorities for smaller police departments, and fostering support by the public. One participant said, *"Most people do not realize how critical a problem child pornography is. We conduct seminars and are working on a weekly information section for the newspaper."* Even if the groups in charge of budgeting for law enforcement services lack financial resources, public support and recognizing the value of law enforcement work in this area may reduce stress by assuring personnel that their work is valued.

*6. Training should encourage bonds among employees, communication by supervisors, and physical exercise.* Rick Anderson, ICAC Program Training Coordinator, and Elizabeth Griffin, Internet behavior consultant, have noted that no or low cost interventions such as communication and exercise can make a big difference in mitigating negative effects of exposure to child pornography. Informal gatherings such as meals and holiday parties can foster a sense of community. Informal check-ins by supervisors can help staff acknowledge

and discuss distress when it occurs. Opportunities for discussions can be provided at staff meetings and during case reviews. Physical activities can be fun and relieve stress. Many survey participants noted the value of exercise.

*7. Basic law enforcement academy training should include information about child pornography cases.* Because the Internet has facilitated the spread of this problem world-wide, these crimes touch law enforcement at every level. Providing basic training about how to approach child pornography cases will promote awareness and assure that personnel have some grounding to respond to cases wherever they emerge.

*8. Conduct research to create evidence based policies and procedures.* Survey participants described a range of negative reactions to work exposure to child pornography. Some of these, such as sexual problems and hyper-vigilance around children seem directly related to viewing images of children being sexually abused. Other reactions could, as some participants noted, arise from the more typical strains of police work. Research should be aimed at 1) identifying which problems are distinctly related to exposure to child pornography, 2) examining what characteristics or circumstances place some individuals at risk for adverse reactions, and 3) establishing which agency policies and practices best alleviate negative impacts.' " (Wolak and Mitchell, 2009).

94.    With regard to these recommendations, which are essentially the standard in the industry, Dr. Aumiller has stated that "of these recommendations you would be hard pressed to find any of them that Suffolk County had met, and this could be a liability concern. The police department has started an initiative to explore options in this area, but to date there is no indication that the Probation Department has followed suit."

95.    Probation Officer Bidot should not have done this job for the length of time he had done it for with the Suffolk County Probation Department.

96.    Dr. Aumiller has stated, "Three to five years is generally recommended for a length of time in this type of unit. There are also warnings in the literature to transfer someone as soon as he asks to transfer and get them away from child pornography, with

more dire warnings that it can ruin an officer's sensibilities. That seems to be the case with Officer Bidot, so it is directly causal."

97.    At no time did Defendants provide, offer or make available a psychologist or any mental health worker working with the probation officers in the sex offender unit. Plaintiff had no outlet and there was no one that could intervene in his case.

98.    Plaintiff has suffered from ongoing mental anguish, emotional pain and suffering, embarrassment, humiliation, depression, and psychological damage as a result of the ongoing denial of services and treatment and continuous discrimination and retaliation. Prior to receiving treatment for his anxiety, depression, and psychological damage related to this claim, Plaintiff had never received any such treatment. The course of treatment which Plaintiff has undergone includes over a year of therapy treatment and medication management, all of which was caused by the Defendants.

99.    There were no other white, non-gay persons, forced to remain in the Sex-Offenders Unit for 11-1/2 years. In fact, at the time Plaintiff was transferred from the unit, Plaintiff had the most time in the Sex-Offenders Unit.

100.    Upon information and belief, there was a practice that when someone requested a transfer out of the Sex-Offender unit, there were no questions asked, and the individual would be transferred.

101.    Defendants continued to press charges and specifications against Plaintiff despite their being fully informed that the charges were baseless. Their actions were both

intentional and punitive and aimed at causing Plaintiff further and permanent injury, pain and suffering.

102. Defendants County, Larsen, Branco Stitt and Neubauer have made a conscious, calculated effort to punish and silence Plaintiff Bidot for demanding equal and fair treatment, equal payment and proper care for the harm done to him and ignored his needs and the industry standards all of which should have been applied to Plaintiff Bidot.

103. Defendant County, Larsen, Branco, Stitt, Neubauer, and John Does 1-10 have retaliated against Plaintiff Bidot in response to Plaintiff's opposition to discriminatory and retaliatory treatment, and his reasonable request that they comply with the law.

104. In addition, these policies and practices of discrimination have contravened Defendants' putative goals, positions, and mission.

105. Plaintiff Bidot's efforts to remedy this situation have been met with refraction, resistance, false charges, retaliation and indifference, which are in violation of the applicable laws, industry standards and undermine Defendant County's own Equal Employment Opportunity Policy.

106. Plaintiff was terminated on September 17, 2019. This was Plaintiff's second wedding anniversary

107. As a result of these unfair and unlawful practices, involving sex/gender discrimination, unequal pay, unfair promotions and retaliation have caused a significant loss of wages, title, benefits, value of retirement, standard of living, esteem and reputation.

108.    Furthermore, Plaintiff Bidot has suffered physical detriment, emotional distress, embarrassment, humiliation, PTSD, disgrace and other injuries.

## AS AND FOR A COUNT I
## TITLE VII, CIVIL RIGHTS ACT of 1964, 42 U.S.C. § 2000e

109.    Plaintiff repeats and reiterates the allegations set forth in paragraphs 1 through 108 inclusive of this *Amended Complaint*, with the same force and effect as though herein fully set forth herein.

110.    Defendant COUNTY,  through their agents and employees, discriminated against the Plaintiff in his employment based on Plaintiff's race, color, national origin and sex/gender/sexual orientation,  in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended.

111.    As a direct result of said acts, Plaintiff has suffered and continues to suffer loss of income.  Plaintiff suffered loss of other employment benefits and continues to suffer distress, humiliation, embarrassment as a result of the differential and discriminatory treatment and hostile work environment.

112.    As a direct result of aforementioned acts, Plaintiff has been deprived of his rights, deprived of his freedoms, physically and mentally harmed.  Plaintiff has been forced to seek redress in the courts rather than capitulating to the previously mentioned abuse, ridicule, and discrimination.

113. Plaintiff has been subjected to humiliation, ignominy, loss of title/status, untimely removal from his position, and removal from his assignment. As a result, Plaintiff has experienced a diminution in his quality of life.

114. Plaintiff was refused status, transfer, benefits, resources and trust awarded to other employees who were similarly situated, excepting the fact that they are not Latino and are not Gay. Were Plaintiff a white straight person, rather than a Latino Gay man, he would not have been subjected to the adverse employment actions, denial of transfer, subjected to charges and specification, being placed on trial to have to save his career and subjected to the intense abuse and humiliation that continues.

115. Plaintiff has incurred incidental fees/damages, loss of pay, loss of benefits, and other damages/ injuries due to COUNTY's unlawful discrimination.

116. Further, once Plaintiff protested such unequal and unlawful treatment, Defendant COUNTY retaliated against him by creating and continuing his harmful placement, suspending him without pay, subjecting Plaintiff to more and greater charges, and other wrongful actions, and continued exposure to sex offenders.

117. As a direct result of said acts, Plaintiff has suffered, and continues to suffer, loss of income, loss of wages, loss of benefits, loss of retirement benefits, loss of longevity, loss of status, loss of opportunities, distress, humiliation, embarrassment, psychological trauma, and damage to his reputation as alleged in the preceding paragraphs of the within Complaint.

118.     That by reason of the foregoing, Plaintiff Bidot is now suffering and will continue to suffer irreparable injury and monetary damages has been subjected to economic losses and psychological injury, distress, pain, suffering, loss of self-esteem, self-doubt, disgrace, public humiliation, embarrassment, inconvenience, anxiety and frustration, and, thus, has been damaged in excess of five million ($5,000,000.00) dollars, as well as punitive damages, costs and attorney's fees.

## AS AND FOR COUNT II
## 42 U.S.C. § 1983 – FOURTEENTH AMENDMENT

119.     The Plaintiff repeats, reiterates, and re-alleges each allegation contained in paragraphs 1 through 118 of this *Amended Complaint* with the same force and effect as though fully set forth herein.

120.     Defendant COUNTY as well as its agents, Defendants COUNTY, LARSEN, BRANCO, STITT, NEUBAUER, and JOHN DOES 1-10, discriminated against the Plaintiff in his employment based on Plaintiff's race, color and sex/gender/sexual orientation, in violation of the Fourteenth Amendment to the United States Constitution.

121.     The Defendants LARSEN, BRANCO, STITT, NEUBAUER, and JOHN DOES 1-10 made decisions to discriminate against, and violate the rights of Plaintiff individually and in collusion with each other.

122.     Defendants COUNTY as well as its agents, Defendants LARSEN, BRANCO, STITT, NEUBAUER, and JOHN DOES 1-10, as state actors, acting under color of law,

36

proximately caused the deprivation of Plaintiff's federally protected rights, secured by the Fourteenth Amendment, as well as federal legislation, such as Title VII and §1981.

123. Specifically, Defendants COUNTY as well as its agents, Defendants LARSEN, BRANCO, STITT, NEUBAUER, and JOHN DOES 1-10, deprived Plaintiff Bidot of the equal protection of the law, refused to transfer him and provide protections against harm, forced him to work due to his being Latino, denied transfer to Plaintiff knowing that doing so was causing him irreparable harm, and commenced false charges against Plaintiff in violation of the Fourteenth Amendment, §1981 and, Title VII.

124. Plaintiff was also denied reassignment without due process because of his race, color and sex/gender, in violation of the Fourteenth Amendment.

125. As a direct result of said acts, Plaintiff has suffered, and continues to suffer, loss of income, loss of wages, loss of benefits, loss of retirement benefits, loss of status, loss of opportunities, loss of title, distress, humiliation, embarrassment, psychological trauma, and damage to his reputation as alleged in the preceding paragraphs of the within Complaint.

126. That by reason of the foregoing, Plaintiff Bidot has been subjected to economic losses and psychic injury, distress, pain, suffering, loss of self-esteem, self-doubt, disgrace, public humiliation, embarrassment, inconvenience, anxiety and frustration, and, thus, has been damaged in excess five million ($5,000,000.00) dollars, as well as punitive damages, costs and attorney's fees.

## AS AND FOR COUNT III
## 42 U.S.C. § 1983 – MUNICIPAL VIOLATIONS

127.    The Plaintiff repeats, reiterates, and re-alleges each allegation contained in paragraphs 1 through 126 of this *Amended Complaint* with the same force and effect as though fully set forth herein.

128.    Defendants COUNTY and DEPARTMENT, acting under color of law, and through their employees, servants, agents and designees, have engaged in a policy, custom, and/or condoned a longstanding practice, which has deprived Plaintiff and other female employees of rights, privileges and immunities secured by the Fourteenth Amendment, Title VII, and the 42 U.S.C. §1981. These actions were, and continue to be, condoned by COUNTY policy makers, including but not limited to, Defendant COUNTY, Defendant DEPARTMENT, and LARSEN, BRANCO, STITT, NEUBAUER, and JOHN DOES 1-10.

129.    Defendants, intentionally and knowingly, as an act of discrimination based on race, color and/or sex/gender/sexual orientation, refused to transfer Latino and Gay male employees, such as the Plaintiff, within the DEPARTMENT because of their race, color and/or sex/gender/sexual orientation. Defendants also retaliated against Plaintiff for his protestations to race, color and/or sex/gender/sexual orientation based discrimination.

130.    Defendants COUNTY and DEPARTMENT were further aware of the systematic practice of unlawful race, color and/or sex/gender/sexual orientation based discrimination within the DEPARTMENT, yet failed to address, remedy, or change said

systematic practices, which work to the detriment of Plaintiff BIDOT and other persons situated similarly.

131.    Defendants, intentionally and knowingly materially altered the terms and conditions of Plaintiff's employment in retaliation for protesting discriminatory practices within the DEPARTMENT. Defendants COUNTY and DEPARTMENT were further aware of the systematic practices of unlawful race, color and/or sex/gender-based discrimination within the DEPARTMENT, yet failed to address, remedy, or change said discriminatory practices.

132.    Defendants COUNTY and DEPARTMENT failed to adequately train or supervise their upper-level supervisors; specifically, Defendants COUNTY and DEPARTMENT failed to adequately train supervisors on discrimination laws, and failed to exercise adequate supervision over supervisors in order to ensure that discrimination laws were respected.

133.    These discriminatory acts committed by Defendants COUNTY and DEPARTMENT, and by INDIVIDUAL DEFENDANTS, who were responsible for policy decisions and the enforcement thereof, Plaintiff suffered, and continues to suffer, diminished employment, loss of income, loss of other employment benefits, and has suffered and continues to suffer distress, humiliation, and embarrassment.

134.    Defendants' acts of ongoing race, color and/or sex/gender-based discrimination were intended to subjugate Plaintiff BIDOT. By so acting, Defendants have

willfully violated the constitutional rights guaranteed to Plaintiff BIDOT and similarly situated persons by the Fourteenth Amendment.

135.    As a direct result of said acts, Plaintiff has suffered, and continues to suffer, loss of income, loss of wages, loss of benefits, loss of retirement benefits, loss of status, loss of opportunities, loss of title, distress, humiliation, embarrassment, psychological trauma, and damage to his reputation as alleged in the preceding paragraphs of the within Complaint.

136.    That by reason of the foregoing, Plaintiff BIDOT has been subjected to economic losses and psychological injury, distress, pain, suffering, loss of self-esteem, self-doubt, disgrace, public humiliation, embarrassment, inconvenience, anxiety and frustration, and, thus, has been damaged in excess of five million ($5,000,000.00) dollars, as well as punitive damages, costs and attorney's fees.

## AS AND FOR COUNT IV
### 42 U.S.C. § 1981

137.     Plaintiff repeats and reiterates the allegations set forth in paragraphs 1 through 136 inclusive of this *Amended Complaint*, with the same force and effect as though herein fully set forth.

138.     The above discriminatory pattern and practice based on race and color by Defendant COUNTY through their agents and employees violates 42 U.S.C. §1981 as amended by the Civil Rights Restoration Act of 1991 (Publ. Law No, 102-406).

139.     As a direct and proximate result of said acts by COUNTY, DEPARTMENT, LARSEN, BRANCO, STITT,  NEUBAUER, and JOHN DOES 1-10, Plaintiff has suffered loss of employment and continues to suffer loss of income, and has suffered and continues to suffer emotional distress, humiliation, great expense, embarrassment, and damage to his reputation.

140.     Because of Plaintiff's color and race he has been subjected to different, disparate, and abusive  mistreatment as detailed above and has been treated differently than white individuals.

141.     As a direct result of said acts, Plaintiff has suffered, and continues to suffer, loss of income, loss of wages, loss of benefits, loss of retirement benefits, loss of status, loss of opportunities, loss of title, distress, humiliation, embarrassment, psychological trauma, and damage to his reputation as alleged in the preceding paragraphs of the within *Amended*

*Complaint.*

142.    That by reason of the foregoing, Plaintiff Bidot has been subjected to economic losses and psychological injury, distress, pain, suffering, loss of self-esteem, self-doubt, disgrace, public humiliation, embarrassment, inconvenience, anxiety and frustration, and, thus, has been damaged in excess of five million ($5,000,000.00) dollars, as well as punitive damages, costs and attorney's fees.

## AS AND FOR COUNT V
## NYS HUMAN RIGHTS LAW, EXECUTIVE LAW ART. 15 §§ 296 and 290

143.    Plaintiff repeats and reiterates the allegations set forth in paragraphs 1 through 142 inclusive of this *Amended Complaint,* with the same force and effect as though herein fully set forth.

144.    The above discriminatory pattern and practice based on race, color, sex/gender/sexual orientation, and disability by Defendants, their agents, and employees violates New York State law.

145.    As a direct and proximate result of said acts, Plaintiff has suffered loss of status within his employment,  loss of income, loss of employment benefits, and has suffered and continues to suffer emotional distress, humiliation, great expense, embarrassment, and damage to his  reputation.

146.    Because of Plaintiff's race, color, sex/gender/sexual orientation, and/or disability, he has been subjected to different, disparate, and abusive mistreatment as

detailed above and has been treated differently than White individuals in that Plaintiff has been treated as stated herein because of his race, color, sex/gender/sexual orientation and disability.

147.   As a result of Defendant's acts, Plaintiff suffered, and is entitled to damages sustained to date and continuing in excess of five million dollars ($5,000,000.00) as well as punitive damages, costs and attorney's fees.

## PRAYER FOR RELIEF

Wherefore, based on the foregoing, Plaintiff requests judgment as follows:

a.   First Cause of Action: in excess of five million ($5,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

b.   Second Cause of Action: in excess of five million ($5,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

c.   Third Cause of Action: in excess of five million ($5,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

d.   Fourth Cause of Action: in excess of five million ($5,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

e.   Fifth Cause of Action: in excess of five million ($5,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

f.   Attorney's fees and costs, pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 2000e-5(k) and other fee and costs statutes;

g.   A declaratory judgment stating that Defendants wilfully violated Plaintiff's rights secured by federal and state laws as alleged herein;

h.   Injunctive relief: an injunction requiring Defendants to correct all present and past violations of federal and state law as alleged herein; to enjoin the

Defendants from continuing to act in violation of federal and state law as alleged herein; and to order such other injunctive relief as may be appropriate to prevent any future violations of said federal and state laws; and

I.     An Order granting such other legal and equitable relief as the court deems just and proper.

### PLAINTIFF DEMANDS A TRIAL BY JURY

Dated:  Hempstead, New York
        October 26, 2020

                              LAW OFFICES OF
                              FREDERICK K. BREWINGTON

                        By:   _____
                              FREDERICK K. BREWINGTON
                              *Attorneys for Plaintiff*
                              556 Peninsula Boulevard
                              Hempstead, New York  11550
                              (516) 489-6959